**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**THE OHIO STATE UNIVERSITY,**

      **Plaintiff,**

                                    **Case No. 2:12-cv-662**

    **v.**                           **JUDGE GREGORY L. FROST**

                                      **Magistrate Judge Mark R. Abel**

**SKREENED LTD., et al.,**

      **Defendants.**

## <u>OPINION AND ORDER</u>

This matter is before the Court for consideration of the following filings:

(1)     Plaintiff's motion for summary judgment (ECF No. 46), Defendants' memorandum in opposition (ECF No. 51), and Plaintiff's reply memorandum (ECF No. 53); and

(2)     Defendants' motion for summary judgment (ECF No. 48), Plaintiff's combined memorandum in opposition and motion to strike (ECF No. 50), and Defendants' reply memorandum (ECF No. 54).

For the reasons that follow, this Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment (ECF No. 46), **DENIES** Plaintiff's motion to strike, (ECF No. 50), and **DENIES** Defendants' motion for summary judgment (ECF No. 48).

### I.      Background

Plaintiff, The Ohio State University, is in the business of licensing its trademarks for use on numerous items, including t-shirts and other clothing.   Defendant Skreened Ltd. ("Skreened"), which is co-owned by Defendant Daniel Fox, is in the print-on-demand business of selling t-shirts and other clothing via its website and a retail store located in Columbus, Ohio.   Defendants'

business model consists primarily of operating a website in which users upload graphic designs or similar content onto the Skreened website.   Other content is received via email or directly from customers' flash drives.   This business model results in sales in one of two ways.   The bulk of sales involve when the uploaded content is displayed on webpages designated either "shops" or "storefronts," and a visitor to the website can peruse the various shops and order a displayed item. Skreened then fulfills each order on demand.   For example, when a customer orders a single t-shirt with a specific design, Skreened then prints one t-shirt featuring that design for that specific customer.   Alternatively, a much smaller percentage of Skreened's sales involve an individual presenting Skreened with content for a private order (typically a bulk order) without also offering the image or design for sale to the greater public via the website.   Skreened still produces the merchandise on demand, but without the potential for Internet traffic sales.

Plaintiff claims that Defendants are selling t-shirts with numerous designs that infringe on Plaintiff's trademarks.   Accordingly, after a period of Plaintiff sending Defendants warning letters, Plaintiff filed this lawsuit in July 2012.   In a four-count amended complaint, Plaintiff asserts claims for the infringement of registered trademarks under 15 U.S.C. § 1114 (Count One), unfair competition and passing off under 15 U.S.C. § 1125(a) (Count Two), violation of the right of publicity under Ohio Revised Code Chapter 2741 (Count Three), and counterfeiting under 15 U.S.C. § 1114 (Count Four) (ECF No. 31 ¶¶ 41-67.)   Defendants in turn assert twenty counterclaims; the first counterclaim alleges that Plaintiff is engaging in unfair competition under Ohio law, and the remaining counterclaims each seek declaratory judgment that a specific design or product does not violate the law.   (ECF No. 32, at Page ID # 340-64 ¶¶ 1-139.)   Both sides have filed motions for summary judgment, which are ripe for disposition.   (ECF Nos. 46, 48.)

2

## II.    Discussion

### A.    Standard Involved

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.   *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).   A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "   *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B.    Analysis

Involved in this litigation are several registered trademarks held by Plaintiff and used on clothing and other merchandise by its licensees: two "BUCKEYES" marks, registration numbers

3

1,152,683 and 1,267,035; a "BUCKEYE DESIGN" mark, registration number 2,437,954; two

"OHIO STATE" marks, registration numbers 1,294,114 and 1,152,682; and "OSU" mark,

registration number 1,121,595; an "OHIO STATE UNIVERSITY" mark, registration number

1,294,115; a block "O" mark, registration number 2,689,612; a Brutus head mark, registration

number 4,028,867; a 'THE SHOE" mark, registration number 3,186,508; a "SCARLET & GREY"

mark, registration number 3,173,656; a Gold Pants design mark, registration number 3,394,719; a

"GOLD PANTS" mark, registration number 3,394,720; the Ohio State athletic logo design mark,

registration number 2,094,602; and a running Brutus mark, registration number 4,266,878.

Plaintiff is also asserting common law rights in the marks "OSU," "Brutus," and "Go Bucks."

Over the course of this litigation, Plaintiff has narrowed its case to proceeding against Defendants

on only select t-shirt designs.

## 1. Federal Claims

As noted, this action presents claims for trademark infringement, unfair competition and

passing off, violation of the right of publicity, and counterfeiting.   The first of these claims

constitutes the Count One trademark infringement claim under 15 U.S.C. § 1114.   To establish

trademark infringement under this provision of the Lanham Act, Plaintiff must prove that (1) it

owns a valid trademark; (2) Defendants used the trademark "in commerce" and without Plaintiff's

authorization; (3) Defendants used the trademark (or an imitation of it) "in connection with the

sale, offering for sale, distribution, or advertising" of goods or services; and (4) Defendants' use of

the trademark is likely to confuse consumers.   15 U.S.C. § 1114(a).   The "touchstone of liability"

for federal trademark infringement claims brought under 15 U.S.C. § 1114 "is whether the

defendant's use of the disputed mark is likely to cause confusion among consumers regarding the

origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997); *see also Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007).

In Count Two, Plaintiff then asserts a federal claim of unfair competition predicated on asserted trademark infringement; the theory is that Defendants are passing off their goods as official merchandise. This second claim rests on § 43(a) of the Lanham Act, which is codified at 15 U.S.C. § 1125(a). That statutory provision provides in pertinent part:

> **(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
>> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> **(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Thus, this § 1125(a) unfair competition claim, like the § 1114 trademark infringement claim, asks whether there is a likelihood of confusion among consumers regarding the origin of the goods offered by the parties. In fact, the same likelihood of confusion test applies. *Audi AG & Volkswagen of America, Inc. v. D'Amato ("Audi AG")*, 469 F.3d 534, 542 (6th Cir. 2006) ("Under the Lanham Act, 15 U.S.C. § 1051 *et seq.,* we use the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks.").

In Count Four, Plaintiff then asserts a claim for counterfeiting under 15 U.S.C. § 1114.

This claim is not redundant to the prior claims, as another judicial officer in a sister District has explained:

> Even if a mark is infringing, that mark is not necessarily counterfeit, because, while "[c]ounterfeiting is a subset of trademark infringement [and] [a]ll counterfeits infringe . . . not all infringements are counterfeit." 2–5 Gilson on Trademarks § 5.19 (2008).   Infringement, therefore, is merely one prerequisite to a finding of a counterfeit mark.  *Too, Inc. v. TJX Cos.*, 229 F.Supp.2d 825, 837 (S.D. Ohio 2002).  Counterfeiting is "the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark." *Id.* (citation omitted).  A mark will only be considered counterfeit when it is "identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.
>
> While infringement may well create confusion in the minds of consumers, counterfeiting is the "passing off" of the infringing mark as the registered mark. *See Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 142 (4th Cir.1998); *Unique Concepts v. Manuel*, No. 85–C–4181, 1986 U.S. Dist. LEXIS 22765, at *49 (N.D.Ill. July 15, 1986); 4 J.T. McCarthy § 25:10 (2009).

*Schneider Saddlery Co., Inc. v. Best Shot Pet Prods. Int'l, LLC*, No. 1:06-CV-02602, 2009 WL 864072, at *4 (N.D. Ohio Mar. 31, 2009).   Thus, to establish liability for trademark counterfeiting, Plaintiff must first prevail on its infringement claim and then also show that Defendants intentionally used Plaintiff's mark knowing it was a counterfeit.  *See id.* at *3.

The Sixth Circuit has in turn explained a counterfeiting claim as follows:

> The Lanham Act prohibits the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale . . . of any goods or services [where] such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a).  To recover on a federal trademark counterfeiting claim, a plaintiff must show that: (1) the defendant infringed a registered trademark in violation of 15 U.S.C. § 1114; and (2) the defendant intentionally used the mark knowing it was a counterfeit as the term counterfeit is defined in 15 U.S.C. § 1116.  15 U.S.C. § 1117(b).  Section 1116 defines "counterfeit mark" as "a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered."  15 U.S.C. § 1116(d)(1)(B)(i). Elsewhere, the statute provides additional clarification, defining "counterfeit" as "a

> spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

*Laukus v. Rio Brands, Inc.*, 391 F. App'x 416, 425 (6th Cir. 2010).   Plaintiff argues that it is entitled to summary judgment because, under the foregoing standard, a reasonable jury could only conclude that Defendants' shirts are identical to or substantially indistinguishable from shirts sold by Plaintiff's licensees.   This Court agrees.

In addition to infringement, discussed below, the marks involved in Count Four satisfy the additional counterfeit claim element of Defendants intentionally using marks knowing they were counterfeit.   There are three Skreened t-shirts featuring running Brutus, one of which also bears the text "You just got NUTTED on."   Another Skreened t-shirt features Brutus and the text "Brutus is my hero."   Three Skreened t-shirts display the Ohio State athletic logo, with two of the designs featuring accompanying text.   Two other Skreened t-shirts feature the words "Ohio State," while four Skreened t-shirts feature the block O.   The Gold Pants design is set forth on two Skreened t-shirts, and another Skreened t-shirt features the words "Scarlet & Gray."   These shirts are all either identical to or substantially indistinguishable from shirts sold by Plaintiff's licensees. Defendants were not licensees, and if fact Defendant Fox testified that licenses were not part of Skreened's business model.   There is no evidence suggesting even a credible inference that Defendants believed they were selling genuine goods.

There is one qualification to this disposition of Count Four.   Defendants argue that their "running Brutus" knockoffs cannot be regarded as counterfeits because Plaintiff did not register this mark until January 1, 2013.   As noted, registration of the mark is a prerequisite to recovering on a federal trademark counterfeiting claim.   Therefore, the Court does not grant summary judgment on Count Four in regard to running Brutus t-shirts by Skreened prior to the date of

7

registration.   The Court emphasizes that this speaks only to the counterfeiting claim and not to the other federal claims.

Subject to a few exceptions discussed below, Defendants do not dispute as to whether Plaintiff owns valid trademarks, whether Defendants used trademarks "in commerce" and without Plaintiff's authorization and whether Defendants used the trademark (or an imitation of it) "in connection with the sale, offering for sale, distribution, or advertising" of goods or services. Rather, the parties' debate largely centers on the core issue of whether a likelihood of confusion exists.   Thus, cognizant of the foregoing statutes and relevant case law, the Court turns to this issue.   This Court recognizes, however, that the following discussion is more relevant to Counts One and Two than Count Four.   This is because "[w]here, as here, the infringing products are counterfeits, likelihood of confusion may be presumed." *Coach, Inc. v. D & N Clothing, Inc.*, No. 10-12813, 2011 WL 2682969, at *3 (E.D. Mich. July 11, 2011).

The Sixth Circuit has set forth eight factors that guide the likelihood-of-confusion inquiry: (1) the strength of Plaintiff's mark; (2) the relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the likely degree of purchaser care; (7) Defendants' intent in selecting the mark; and (8) the likelihood of expansion of the product lines.   *See Audi AG*, 469 F.3d at 542-43; *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792-93 (6th Cir. 2004); *Frisch's Restaurant, Inc.*, 759 F.2d at 1264; *Frisch's Restaurants, Inc.*, 670 F.2d at 648.   None of these factors are dispositive.   Instead, as the appellate court has explained,

> [t]hese factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely.   They are also interrelated in effect.   Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case . . . . *The ultimate question remains*

8

> *whether relevant consumers are likely to believe that the products or services*
> *offered by the parties are affiliated in some way.*

*AutoZone, Inc.*, 373 F.3d at 793. *See also Stilson & Assocs., Inc.*, 129 F. App'x at 997. The Court shall proceed to address each interrelated factor.

**Strength of Plaintiff's mark.** The Sixth Circuit Court of Appeals has stated that "[t]he strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and, therefore, the more protection it is due." *Frisch's Restaurant, Inc.*, 759 F.2d at 1264. Further, as that court explained, " '[a] mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both.' " *Id.* (quoting Callmann, *Unfair Competition, Trademarks & Monopolies*, ¶ 20.43 (4th ed. 1983)).

Plaintiff directs this Court to precedent supporting its argument that its marks are distinctive, while Defendants have failed to introduce a factual issue in this regard. The undersigned has previously recognized that "Ohio State has federally registered trademarks on the terms 'Buckeye,' 'Ohio State,' 'Ohio State University,' 'OSU,' and on the block 'O,' the buckeye leaf, and the Athletic Logo." *The Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 750 (S.D. Ohio 2010). Other judges in this District have approved consent orders recognizing the distinctiveness of the marks involved.

**Relatedness of the goods.** The Sixth Circuit has explained that the relatedness factor involves three basic criteria: "First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are

unrelated, confusion is highly unlikely." *AutoZone, Inc.*, 373 F.3d at 797 (quoting *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003)). Thus, the appellate court has noted, "[t]he relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Id.* (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002) (quotation omitted)). There is no question here that the goods involved in this litigation are similar. Plaintiff's licensees and Defendants are competitively selling t-shirts.

**Similarity of the marks.** The Sixth Circuit has held that "in reviewing the similarity of marks the commercial context must be considered. . . . '[I]t is the effect upon prospective purchasers that is important.' " *Frisch's Restaurant, Inc.*, 759 F.2d at 1266 (quoting *McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126 (2d Cir. 1979)). This inquiry does not involve a simple product-to-product comparison. Rather, the Sixth Circuit has explained:

> "When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." [*Daddy's Junky Music Stores, Inc.,* 109 F.3d at 283.] A side-by-side comparison of the litigated marks is not appropriate, although naturally the commonalities of the respective marks must be the point of emphasis. Instead, "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Id.* (quotations omitted).

*AutoZone, Inc.*, 373 F.3d at 795. The correct approach is therefore to view the marks as a whole and not by the individual features of the marks. *See Therma-Scan, Inc.*, 295 F.3d at 634. Viewed in this light, the marks used by Defendants are indeed capable of confusing consumers. It is indisputable that the marks involved in this litigation are similar; often, they are even identical.

10

**Evidence of actual confusion.**    It is well settled that "proof of actual confusion is not necessary to obtain injunctive relief in a Lanham Act case, but it is obviously the most probative proof of the likelihood of confusion."   *Frisch's Restaurant, Inc.*, 759 F.2d at 1267.   Moreover, "proof that the buying public was actually deceived is necessary in order to recover statutory damages under the Lanham Act."   *Audi AG*, 469 F.3d at 542.

There is no evidence of actual confusion in this case.

**Marketing channels used.**    This factor is concerned with " 'the parties' predominant customers and their marketing approaches.   Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases.' " *AutoZone, Inc.*, 373 F.3d at 793 (quoting *Therma-Scan, Inc.,* 295 F.3d at 636).   Here, the evidence indicates that Plaintiff's licensed products are marketed through various methods employing diverse media, including the Internet.   Use of internet marketing is notable because, as the Sixth Circuit has explained, the

> "[s]imultaneous use of the Internet as a marketing tool exacerbates the likelihood of confusion," given the fact that "entering a web site takes little effort—usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership."

*Audi AG*, 469 F.3d at 544 (quoting *PACCAR Inc. v. TeleScan Tech., L.L.C.,* 319 F.3d 243, 252 (6th Cir. 2003), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004)).   Thus, the use of the Internet to market licensed products bearing Plaintiff's marks and Defendants' concurrent reliance on the Internet mean that this factor also favors Plaintiff.

**Likely degree of purchaser care.**    In examining the degree of purchaser care involved,

this Court remains cognizant that " 'the standard used by the courts is the typical buyer exercising ordinary caution.' "  *AutoZone, Inc.*, 373 F.3d at 793 (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 285 (6th Cir. 1997)).   Additionally, "[t]he Sixth Circuit has explained that the purchaser care factor 'often will depend upon its relationship with the other seven factors.' "  *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 520 (6th Cir. 2007) (quoting *Daddy's Junky Music Stores, Inc.*, 109 F.3d. at 285).

Thus, the fact that licensed and unlicensed clothing products of the sort involved here are often distributed in the same environments, such as the Internet, matters because when products "are distributed in the same environments, it is likely the case that buyers exercise comparatively little care in selection and the likelihood of confusion is accordingly somewhat higher."  *Id.* Some confusion may also result in light of the apparent indifference of the average consumer to such purchases at the price point involved.  *See Therma-Scan, Inc.*, 295 F.3d at 638 (citing *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1111 (6th Cir. 1991)) (noting that as the cost or unusual nature of a purchase increases, the expectation of a higher degree of care involved in the purchase also increases).   The price factor favors Plaintiff, although the Court recognizes that it is hardly dispositive of presenting a likelihood of confusion beyond dispute given the totality of the facts.  *See Little Caesar Enter., Inc.*, 834 F.2d at 572 (essentially disregarding a district court's conclusions regarding the likely degree of purchaser care because "it probably makes little difference on the facts before [the court]").   Given the similarity of the marks and the graphic designs involved here, it is also important to note that "where marks are sufficiently similar, even a knowledgeable purchaser might incorrectly assume that he is purchasing the product of another party."  *Leelanau Wine Cellars, Ltd.*, 502 F.3d at 520.

**Defendants' intent in selecting the mark.**   The Sixth Circuit has explained that "[i]f a party chooses a mark with the intention of creating confusion between its products and those of another company, 'that fact alone may be sufficient to justify an inference of confusing similarity.' " *Therma-Scan, Inc.*, 295 F.3d at 638 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 286 (citation omitted)).   Thus, "[c]ircumstantial evidence of copying, particularly 'the use of a contested mark with knowledge of the protected mark at issue,' is sufficient to support an inference of intentional infringement where direct evidence is not available."   *Id.* at 638-39 (quoting *Daddy's Junky Music Stores,* 109 F.3d at 286).

Such circumstantial evidence exists here, at least in regard to the identical marks.   Plaintiff has objected to Defendants' conduct since 2009, including multiple times in 2011, and Defendants have continued to sell their products bearing counterfeit or otherwise infringing marks even in light of these objections.

**Likelihood of expansion of the product lines.**   The Sixth Circuit "has explained that although evidence that either party will likely expand its product lines supports finding a likelihood of confusion, '[a] finding that the parties will not expand their marks significantly . . . does not address the ultimate issue of likelihood of confusion.' "   *Therma-Scan, Inc.*, 295 F.3d at 639 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 287) (internal quotation marks and citation omitted)).   Consequently, given the relative dearth of testimony or other evidence on concrete as opposed to merely possible plans for expansion, this Court cannot say that this factor weighs in favor of either party.

Taking all of the foregoing factors into account and necessarily viewing all of the evidence in a light most favorable to the respective non-moving parties, however, the Court concludes that a

13

reasonable jury could only reach the conclusion that consumer confusion is likely to occur. The t-shirts employ either counterfeit marks or colorable imitations of marks so that they appear to be officially licensed or affiliated products. The goods are related, the sellers of the products involved often use common marketing channels to target consumers, and there is a relatively low degree of purchaser care. The touchstone question is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *AutoZone, Inc.*, 373 F.3d at 801 (quoting *Homeowners Group, Inc.*, 931 F.2d at 1107). There is thus a presumed likelihood of confusion for Count Four and an inescapable conclusion of a likelihood of confusion for Counts One, Two, and Four. This likelihood, together with the evidence informing the remaining (and often undisputed) elements of each respective claim, means that Plaintiff is entitled to summary judgment on its federal claims.

### 2. State Law Claim

Count Three of Plaintiff's amended complaint is a claim for violation of the right of publicity under Ohio Revised Code Chapter 2741. That chapter prohibits a person from using any aspect of an individual's persona for a commercial purpose both during the individual's lifetime and for sixty years after his or her demise, unless otherwise permitted by the statutory scheme. Ohio Rev. Code § 2741.02(A)(1)-(2). The statutory scheme affords such permission under limited circumstances, such as when "the person first obtains the written consent to use the individual's persona . . . ." Ohio Rev. Code § 2741.02(B).

The statutory scheme defines the "right of publicity" to mean "the property right in an individual's persona to use the individual's persona for a commercial purpose." Ohio Rev. Code § 2741.01(D). "Persona" in turn "means an individual's name, voice, signature, photograph,

14

image, likeness, or distinctive appearance, if any of these aspects have commercial value.   Ohio Rev. Code § 2741.01(A).   Finally, " '[c]ommercial purpose' means the use of or reference to an aspect of an individual's persona . . . [o]n or in connection with a place, product, merchandise, goods, services, or other commercial activities" that are not expressly exempted under Ohio Revised Code Chapter 2741.   Ohio Rev. Code § 2741.01(B)(1).

Plaintiff's claim alleges that Defendants are violating § 2741.02(A) by using the name and likeness of Urban Meyer without permission.   The evidence indicates that Meyer assigned his rights of publicity and persona to Plaintiff, which in turn licenses the persona to authorized licensees who sell t-shirts.   The evidence also indicates that Defendants are not authorized licensees but are nonetheless engaged in offering for sale t-shirts bearing Meyer's name, image, and likeness.   Accordingly, Plaintiff is also entitled to summary judgment on Count Three.

### 3.   Defenses

Defendants raise a number of defenses to Plaintiff's claims, but none of them preclude summary judgment.   Plaintiff characterizes the manner in which Defendants have briefed these defenses as "random, unfocused arguments that obliquely reference some of the [likelihood of confusion] factors, and generally misstate the law."   (ECF No. 53, at Page ID # 1986.)   This harsh assessment is perhaps a bit hyperbolic, although the Court agrees that much of the briefing is less focused than it might be.   That evaluation cuts both ways, however; as discussed in the subsequent section, neither side has presented this Court with comprehensive briefing. Defendants are not wholly feigning confusion when they complain that "Plaintiff does not associate any particular product to any particular alleged trademark."   (ECF No. 51, at Page ID # 1961.)   Although the Court does not fully agree with that complaint, this Court recognizes that

clarity is not always the hallmark of the briefing.   Regardless of the shared slipshoddiness of the

briefing, however, the Court has been able to discern the parties' arguments in regard to the varied

defenses that Defendants assert against Plaintiff's claims.   Some of these defenses may be claim

specific, but it appears that most are intended to encompass all of Plaintiff's claims.

Defendants promote as a defense Skreened's reliance on an "autohold" process in which,

after multiple rights holders complain to Skreened, certain key words describing a design or type

of design targeted by those complaints are placed on the autohold list.   To be placed on the

autohold list, there must be a pattern, or "a couple times" when a complaint is made.   (ECF No.

45, at Page ID # 1507.)   Then when another design is uploaded and described using the same

keywords or in the same terms as those on the autohold list, it triggers an automatic hold on placing

the design related to those words on the website.   A Skreened employee then reviews the held

designs to determine whether the design go "live"—meaning it can be released to the website—or

whether it presents a trademark issue.

According to Skreened's minority owner, since approximately late 2012, Skreened has

employed an "intellectual property specialist" to review complaints of infringement.   This

individual had previously been hired to work in the warehouse, and there is no evidence that he is

an attorney, attended law school, is a paralegal, or has any particular training or background in

intellectual property.   (ECF No. 45, at Page ID # 1510-511.)   There are also no written guidelines

for dealing with infringement issues.   (ECF No. 45, at Page ID # 1509 & 1512.)

The primary problem with this defense is that it suffers from the same deficiency that

underlies many of Defendants' arguments: a carefully careless denial of the reality of the business

in which Defendants are engaged and how the law intersects with that business.   The premise

16

upon which Defendants base their overarching theory of the case is that they are insulated from liability because the designs do not originate with them (with the exception of a marijuana leaf shirt designed by Defendant Fox), but instead come to them via third parties, and it is difficult to police the many designs uploaded on a daily basis.   These third parties are asked not to place infringing content on the website.   But this directive and the fact that some designs are periodically kept off or removed from the website do not insulate Defendants from liability.

Selling knockoffs is selling knockoffs, regardless of who suggested you sell them, regardless of how many other infringing products you decide not to sell, and regardless of how much of a hassle it is to comply with the law.

Because there is no exception in trademark law for infringers who take an ostrich approach to policing their business activities and complying with the law, no reasonable jury could accept Defendants' "*it's too hard/we are the actual victims*" argument.   The argument only attempts to sidestep the issue at the heart of this litigation: regardless of whatever steps taken to avoid infringement, did Defendants infringe on Plaintiff's trademarks?

Alternatively, Defendants argue that liability is improper because the correct focus of their products should be on the messages presented and not on the trademarks involved.   This argument takes three basic forms.

First, Defendants attempt to cloak themselves in the First Amendment, positing that offering t-shirts with images such as those of Urban Meyer is protected political or social speech. But as Plaintiff correctly notes, context matters.   Defendants are using the marks at issue in commerce, selling goods to make money.   Defendants also suggest that this endeavor carries with it a larger "message," discussed in the third point below, and that message has little to do with

17

protected or social speech as Defendants suggest.

Second, Defendants also argue that at least one of their Brutus images and their Go Bucks marijuana leaf design are parodies.   But "[n]ot all parodies and satires . . . are protected as fair use."   *Dallas Cowboy Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979).   Plaintiff directs this Court to persuasive authority in its briefing that an allegation of parody is but one consideration to be considered in the larger context of possible infringement. The evidence here does not in turn suggest that Defendants are seeking to be ironic commentators on academia or college athletic culture; the only evidence before this Court is that Defendants are trying to make a buck by appropriating marks for commercial use.   Thus, Defendants' underdeveloped "simple allusion to the concept of parody" is insufficient to create a genuine issue of material fact precluding summary judgment in favor of Plaintiff.   *Id.*

Third, Defendants appear to pursue making a larger point that the purchase of their wares is to express fan identification with and support for The Ohio State University, so that the individual marks employed are inconsequential means to that end (*i.e.*, there are only so many ways to identify an "O" or to refer to the school and its teams or programs).   As Plaintiff notes, this argument does not necessarily help Defendants because it is the marks that create the identification and demonstration of support.   In other words, the marks are not used to describe Defendants' products, but to embody Defendants' products with meaning that trades on the goodwill and promotion that Plaintiff has and licenses out for profit.

Defendants also posit that they evade summary judgment because Skreened is an Internet Service Provider, an advertiser, and a media company or outlet.   The crux of these arguments is that any of these three statuses would exempt Defendants from liability.   For example,

18

Defendants note that 47 U.S.C. § 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."   Thus, Defendants reason, they are immunized against claims because § 230 preempts Ohio Revised Code Chapter 2741.   Defendants also assert, as another example, that even if Ohio Revised Code Chapter 2741 applies, they fall within the statutory exemption from liability for "[t]he owners or employees of any medium used for advertising."   Ohio Rev. Code § 2741.02(E).

Several points are necessary.   First, Plaintiff is correct that because Defendants failed to plead these various affirmative defenses, they have forfeited reliance on the various statutory exemptions and immunities.   *See* Fed. R. Civ. P. 8(c)(1).

Second, even if Defendants had not forfeited reliance on § 230, they ignore the fact that its immunity provision does not apply in the trademark context or in the context of a state law right of publicity claim.   *See* 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."); 47 U.S.C. § 230(e)(3) ("Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section."); 47 U.S.C. § 230(e)(4) ("Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 . . . or any similar State law."); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1322-324 (11th Cir. 2006); *Ford Motor Co. v. GreatDomains.com, Inc.*, No. 00-CV-71544-DT, 2001 WL 1176319, at *1 (E.D. Mich. Sept. 25, 2001).

Third, even if Defendants had not forfeited reliance on Ohio Revised Code § 2741.02(E) and 15 U.S.C. § 1114(2)(B), they fail present any persuasive authority for construing the statutory

exemptions as broadly as they seek to do.   There is also a dearth of evidence supporting, for

example, the claim that Defendants are paid advertisers.   Instead, there is evidence that this is not

an accurate characterization of Defendants.   The description of Skreened's business model by its

two owners actively and conclusively refutes the core premise upon which Defendants rely.

Defendant Fox, the majority owner of Skreened, testified at his deposition as follows:

> Q.     Okay.   If – what all businesses is Skreened engaged in?

> A.     Could you clarify your question, please.

> Q.     Sure.

> Proctor & Gamble makes soap, they make diapers, they make hair care products.   What products or services does Skreened do?

> A.     We print apparel on an on-demand basis, primarily for retail customers.

(ECF No. 43, at Page ID # 646.)   Michael Alan Limes, who owns a minority stake in Skreened,

similarly testified at his deposition as follows:

> Q.     And Mr. Fox stated that Skreened's business was printing apparel for retail customers.   Is that your knowledge of what Skreened does?

> A.     Yes.

(ECF No. 45, at Page ID # 1493.)   Thus, all of Skreened's owners testified that the company is

simply in the business of printing apparel, without mentioning being in the advertising business or

serving as a provider of any sort.   No reasonable juror could interpret the evidence as Defendants

urge.

Defendants also imply that they were able to use various marks due to registration issues or

the nature of the marks.   For example, they point to the relatively recent registration of the

"running Brutus" mark involved in this case.   The date of registration is largely inconsequential to

20

the issues before this Court, however, given that registration generally informs ownership and incontestability issues.   This is because "The Lanham Act does not create property rights; it merely provides a means of registering and enforcing in the federal courts rights otherwise recognized under the common law."   *Hair Assocs., Inc. v. Nat'l Hair Replacement Servs., Inc.*, 987 F. Supp. 569, 581 (W.D. Mich. 1997).   In other words, "[t]he right to a particular mark grows out of the mark's actual use."   *Official Pillowtex LLC v. Hollander Home Fashions Corp.*, 479 F.Supp.2d 744, 749 (S.D. Ohio 2007) (citing *Homeowners Group v. Home Mktg. Specialists*, 931 F.2d 1100, 1104 (6th Cir. 1991)).   Similarly unpersuasive is Defendants' assertion that Plaintiff is attempting to enforce a lapsed trademark registration when such a trademark is unenforceable. This contention, essentially an abandonment argument, overreaches in positing that § 43(a) of the Lanham Act does not afford protection here.   There is no evidence of abandonment.   Finally, the argument that the phrase "Go Bucks" is not protectable under the Lanham Act misses the point of the Act; when the phrase is implemented in commercial use, it is likely to cause confusion and therefore infringes on Plaintiff's common law trademark.   Again, context matters.

Finally, Defendants dubiously argue that they evade liability under the doctrine of aesthetic functionality.   Reliance on this doctrine is misplaced for two reasons.   First, as another judicial officer in the Northern District has recognized, "[t]he Sixth Circuit expressly has not adopted the concept of aesthetic functionality and has questioned its validity."   *Sherwin-Williams Co. v. JP Int'l Hardware, Inc.*, No. 1:13-CV-2064, 2013 WL 6767815, at *3 (N.D. Ohio Dec. 13, 2013) (citing *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 418 (6th Cir. 2012)). Second, as Plaintiff correctly points out, the aesthetic functionality doctrine is potentially relevant only in the context of trade dress infringement, which is simply not the context at issue here.   *See*

21

*WSM, Inc. v. Tenn. Sales Co.*, 709 F.2d 1084, 1087 (6th Cir. 1983); *Esercizio v. Roberts*, 944 F.2d 1235 (6th Cir. 1991). The claims in this case involve trademarks and not the design of the products on which those trademarks are presented.

### 4. Remaining Issues

In light of the above discussion, Plaintiff is entitled to summary judgment on Counts One through Four of its amended complaint. Defendants are not entitled to summary judgment on any of these claims. These conclusions do not resolve this litigation, however, because several loose ends remain.

One issue is that Plaintiff has combined with its memorandum in opposition to Defendants' motion for summary judgment a motion to strike. (ECF No. 50.) Plaintiff seeks to strike those portions of Defendants' motion for summary judgment briefing that present forfeited affirmative defenses, curiously arguing in part that Defendants' motion is a Federal Rule 12(b)(6) motion that should not be converted into a Rule 56 motion. The Court need not strike the targeted content but can and has simply addressed the relevant portions of the briefing on their merits (or lack thereof). The Court therefore **DENIES** Plaintiff's motion to strike. (ECF No. 50.)

Another issue necessitating discussion is that no party has moved for summary judgment on Defendants' twenty counterclaims. As noted, nineteen of those counterclaims seek declaratory judgment, while the remaining counterclaim asserts unfair competition under Ohio law. The discussion set forth herein certainly informs those claims, but this Court cannot grant a broader summary judgment than requested, and Plaintiff specifically sought only summary judgment on its claims, not the counterclaims. (ECF No. 46, at Page ID # 1611 & 1643.)

Additionally, although today's decision resolves the issue of liability on Plaintiff's claims,

22

the issue of damages remains.   Plaintiff expressly asks this Court to

> issue an order finding that there is both counterfeiting of the registered Ohio State Trademarks and willful infringement of Plaintiff's common law trademarks, and award Plaintiff statutory damages for Defendants' counterfeiting and violation of the rights [*sic*] of publicity of Urban Meyer, its fees incurred in bringing this litigation and a permanent injunction enjoining the Defendants from using the Ohio State Trademarks or any other words or signs or symbols or device that suggest an affiliation, approval, license, connection, sponsorship or endorsement with Ohio State.

(ECF No. 46, at Page ID # 1643.)   The appropriate amount of statutory damages remains unbriefed and therefore unresolved by today's decision.

Also in need of disposition is Plaintiff's request for attorneys' fees based on its argument that this is an exceptional case.   In discussing such requests, the Sixth Circuit has explained that "the Lanham Act allows [an] award of attorney's fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a).   Although this provision does not define 'exceptional,' we have held that 'a case is not exceptional where the trademark infringement was not malicious, willful, fraudulent, or deliberate.' "   *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 505 (6th Cir. 2013) (quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1192 (6th Cir. 1997)).   A defendant can be said to be willful when the defendant has ignored actual notice of ongoing infringing activity.   *Id.* Additionally, the use of counterfeit marks supports an award of attorneys' fees.   *Audi AG v. D'Amato*, 469 F.3d 534, 551 (6th Cir. 2006) (citing *U.S. Structures, Inc.*, 130 F.3d at 1192).

This is an exceptional case that warrants attorneys' fees.   Plaintiff provided Defendants repeated actual notice of much of the infringement involved, and even if they had not received such notice, no reasonable person would have thought that selling t-shirts with identical marks to those licensed and held by Plaintiff was reasonable.   Defendants thus knew or had reason to know that they were selling counterfeit, infringing goods.   The Court in its discretion awards attorneys'

23

fees under § 1117(a).

Finally, the question of whether Defendants Skreened and Fox should be jointly and severally liable remains extant.   In regard to the federal claims, the Court recognizes that "[a]n individual corporate officer, director, owner, or employee can be liable for trademark infringement by the corporation where the individual is either personally involved in the infringement or is willfully blind to infringing activity."   *Coach, Inc. v. D & N Clothing, Inc.*, 2011 WL 2682969, at *3 (citing *Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 478–79 (7th Cir. 2007)).

The undisputed facts satisfy both possibilities here.   Defendant Fox created the Go Bucks marijuana leaf design offered for sale by Skreened.   Such active and personal involvement satisfies the "personally involved" possibility, which Fox appears to concede.   (ECF No. 51, at Page ID # 1963-64.)   The evidence also shows that Fox understood intellectual property enough to know that infringement could occur, that he was aware of complaints by rights holders that necessitated action, that he was aware of multiple, specific communications from Plaintiff seeking to stop the infringing activities, and that although he was aware of licensing, obtaining licenses was simply not part of Skreened's business model.   Despite all of this, he owned (and, with a period of inactivity, ran) a business that included ongoing infringement while apparently, at best, keeping himself in the dark as to the scope of that infringement.   But " ' "[o]strich-like" business practices amount to willful blindness, which is sufficient to show [the] intent necessary to be a contributory infringer' under the Lanham Act."   *Coach, Inc. v. D & N Clothing, Inc.*, 2011 WL 2682969, at *4 (quoting *Microsoft Corp.*, 249 F. App'x at 479).   Unlike the business owner in *Coach, Inc. v. D & N Clothing, Inc.*, there is no evidence here that Fox was similarly potentially unaware and substantially involved.   The evidence in this case instead shows his awareness and

24

his deliberate inaction or insufficient action to remedy problems.   Thus, summary judgment in favor of Plaintiff is warranted on this point in regard to the federal claims.

In regard to the state law claim, Plaintiff fails to present this Court with any argument as to why joint and several liability would be appropriate.   Instead, Plaintiff only perfunctorily lumps in the Ohio Revised Code § 2741.02 claim in with the federal claims in the sub-heading of its memorandum in support of its motion for summary judgment.   (ECF No. 46, at Page ID # 1641.) The actual argument under that sub-heading and in his reply memorandum addresses *only* joint and several liability for the federal claims.   (ECF No. 46, at Page ID # 1641-43; ECF No. 53, at Page ID # 2003.)   This is less than a persuasive way to pursue summary judgment on the state law point because the Court is in the business of resolving the legal arguments presented to it, not in creating or guessing at an argument for a party, guessing at the likely counterarguments, and then passing judgment.   The Court denies summary judgment on this point.

### III.    Conclusion

For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment (ECF No. 46), **DENIES** Plaintiff's motion to strike (ECF No. 50), and **DENIES** Defendants' motion for summary judgment (ECF No. 48).   This Court permanently enjoins Defendants from using the Ohio State trademarks or any other words or signs or symbols or device that suggest an affiliation, approval, license, connection, sponsorship or endorsement with Ohio State.   Having decided the liability issues for Plaintiff's four claims, the Court will address the remaining issues of the counterclaims, damages, the amount of attorneys' fees awarded, and the possibility of joint and several liability on Plaintiff's state law claim with the parties during a telephone status conference that will be promptly scheduled.

25

**IT IS SO ORDERED**.

                                   /s/ Gregory L. Frost

                                  GREGORY L. FROST

                                  UNITED STATES DISTRICT JUDGE